E-FILED
Wednesday, 05 October, 2016  02:26:18 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:15-cr-30021** |
| | ) | |
| **JONATHAN EYMANN and** | ) | |
| **GARY LYONS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER AND OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Just after midnight on July 21, 2013, Defendant Jonathan Eymann and his uncle, Defendant Gary Lyons, landed a small, private airplane in Litchfield, Illinois.  Suspecting drug trafficking, police followed Eymann and Lyons to a nearby hotel and confronted them in the hotel's parking lot.  The encounter culminated in their arrests, and Eymann and Lyons were charged with conspiring to distribute marijuana and possessing marijuana with intent to distribute.  Lyons was also charged with possessing a firearm during a drug trafficking crime.

Eymann and Lyons have filed a motion to suppress the evidence against them.  They argue that they were either unconstitutionally detained or unconstitutionally arrested and that the Court should suppress both the evidence found during the encounter in the parking lot and the evidence found later in the airplane itself.

The Court presided over six full days of evidentiary testimony and granted the parties leave to file post-hearing briefs.  The Court has now reviewed the parties' briefs and the evidentiary record.  For the reasons below, the motion to suppress (d/e 26) is DENIED.

## I.   BACKGROUND

The parties agree on the broad outline of what happened on the night of the arrest, though they disagree on many of the specifics.  On May 24, 2013, and again on the weekend of June 21, 2013, the aircraft at issue in this case made two trips from California to Pittsburgh and returned after spending only a few hours at the destination and after landing to refuel late at night at desolate airports.  The Air and Marine Operations Center (AMOC), a federal law enforcement agency within U.S. Customs and Border Protection, tracked these flights and found them suspicious.  On

June 24, 2013, Robert Keller, an AMOC intelligence research specialist, emailed AMOC law enforcement officer Jeff Spencer regarding those flights, as well as other factors that AMOC considered suspicious.  On July 20, 2013, AMOC monitored the plane on its third eastbound trip from California and eventually anticipated that the plane would be landing in Litchfield, Illinois, around midnight.  Jeff Spencer called Department of Homeland Security (DHS) Special Agent Glen Harrington to inform him about the incoming plane and its related history.  Jeff Spencer is now deceased and did not testify. Several DHS officers, together with several officers of the Litchfield Police Department (LPD), convened and headed to Litchfield's small airport.

Shortly after midnight, the plane landed in Litchfield as expected.  Eymann and Lyons parked the plane, loaded their bags and a box into an airport courtesy car, and drove away at around 12:25 a.m.  The officers followed.

Eymann and Lyons drove for about a mile and arrived at a nearby Quality Inn at around 12:30 a.m., with the officers close behind.  (Tr. at 252, 882, 1260-62.)  In the parking lot, Eymann and Lyons parked and exited the courtesy car, but the officers—who

had boxed in the courtesy car by parking their vehicles on either side of it—approached the pair and initiated an encounter.  The agents were armed and wore uniforms bearing law enforcement insignia, and the lights on at least two of the police vehicles were flashing.  A total of 7-9 officers were on the scene, along with several police vehicles.

Agent Harrington and DHS Resident Agent in Charge Michael Mitchell approached Eymann and Lyons in the parking lot.  Agent Mitchell identified himself and asked Lyons questions about the nature of his trip.  Lyons responded that he was going from California to Pittsburgh on business.

Agent Harrington asked Lyons for his identification.  Lyons turned over his identification, and Agent Harrington then approached Eymann, who also turned over his identification.  Agent Harrington returned to his police vehicle to check for warrants on the pair.

As Agent Mitchell and Lyons spoke, Lyons began to feel light-headed.  The parties dispute whether Lyons fainted and started falling into Agent Mitchell, or whether Lyons simply bent over with his hands on his knees.  But the parties agree that Lyons began

experiencing some sort of physical episode, and that the officers brought Lyons to the front passenger seat of Litchfield Police Chief Byron Wilkinson's vehicle.  Lyons sat in the front seat with the air conditioning on, and the officers provided Lyons with water.

While the other officers dealt with Lyons, Agent Harrington learned that the suspects had no outstanding warrants.  Agent Harrington approached Eymann again and asked whether Eymann had any marijuana.  Eymann admitted that he had a small amount of personal use marijuana in the courtesy car.

The Government says that Arie, a drug-detection dog, arrived shortly after Eymann admitted to having marijuana in the courtesy car.  In the Government's telling, the dog alerted to the courtesy car and then alerted to Eymann's backpack after officers removed the bags from the car.  The officers found marijuana in the backpack and arrested Eymann and Lyons.  Eymann and Lyons, by contrast, say that the officers searched the car and the bags and arrested them before the drug-detection dog.

After the officers recovered the marijuana from the car, they handcuffed and formally arrested Eymann and Lyons.  The officers then transported the suspects back to the Litchfield airport.  The

officers deployed Arie around the plane, and Arie alerted.  The officers opened the plane using a key obtained from Lyons during the arrest.  Upon opening the plane, "there was an overwhelming smell of marijuana." (Tr. 684.)  The officers searched the bags that were in the plane, which contained 65 pounds of marijuana.  (Tr. at 690.)  The officers also found a handgun in the plane.  (Tr. 690.)

After the officers seized the marijuana and the firearm, they advised both Eymann and Lyons of their Miranda rights, then interviewed both Eymann and Lyons.  Lyons admitted to making two previous trips from California to Pennsylvania during which he would drop Eymann off with some luggage, Eymann would meet with a subject, then Lyons would pick Eymann up without the luggage.  Lyons stated he suspected the luggage contained narcotics.  (Tr. 704.)  Eymann admitted to organizing the marijuana deals.

State prosecutors charged Eymann and Lyons in Montgomery County Circuit Court with possessing marijuana, and Eymann and Lyons sought to suppress the evidence.  The court held that Arie's alert to the plane did not establish probable cause to search because Arie was not technically certified on the date of the events.

Thus, the court found that the search of the plane was unlawful. The court also found that the encounter at the hotel was a warrantless search and that the inevitable discovery doctrine did not apply. The court therefore suppressed the evidence obtained from the searches. The state prosecutors chose to <u>nolle prosequi</u>, and the case was dismissed without prejudice.

In 2015, the U.S. Attorney's Office filed federal charges against Eymann and Lyons. Eymann and Lyons filed a motion to suppress the evidence against them based on a variety of grounds.

## II.   ANALYSIS

### A.  The Encounter Outside The Hotel Was A Terry Stop

Eymann and Lyons argue that the evidence must be suppressed because the encounter in the hotel parking lot was, at a minimum, an impermissible Terry stop not supported by reasonable suspicion. The Government contends that the encounter began as "consensual" and later became a Terry stop supported by reasonable suspicion (Gov. Post-Hrg. Br. at 27).

Police may briefly detain a person for investigatory purposes in what is known as a "Terry stop." <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). An officer may conduct such a Terry stop when the officer has a

reasonable, articulable suspicion that the person has been or is about to be engaged in criminal conduct.  United States v. Breland, 356 F.3d 787, 791 n.1 (7th Cir. 2004).  Though a Terry stop may temporarily deprive an innocent person of his freedom of movement, a Terry stop is "a far more minimal intrusion" than an arrest, "simply allowing the officer to briefly investigate further."  Illinois v. Wardlow, 528 U.S. 119, 126 (2000).

To determine whether a given interaction with police was a Terry stop or a consensual encounter, the question is whether a "reasonable person" would feel free "to disregard the police and go about his business."  United States v. Williams, 945 F.2d 192, 196 (7th Cir. 1991) (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)).  If so, the interaction was merely a consensual encounter.

In assessing whether a Terry stop occurred here, the Seventh Circuit's recent decision in United States v. Smith proves illuminating.  794 F.3d 681 (7th Cir. 2015).  In Smith, two officers on bicycles were investigating gunshots at night when they saw the defendant crossing the street toward an alleyway.  The officers rode ahead of the defendant into the alley and stopped five feet from the defendant.  One officer dismounted, approached the defendant, and

asked whether he had any weapons in his possession.  The
defendant said he did, and the officers arrested him.

The Seventh Circuit found that "in light of all the
circumstances surrounding the encounter" the incident was a Terry
stop requiring reasonable suspicion.  Id. at 682.  In so holding, the
Seventh Circuit focused on several factors: "the location of the
encounter in a dark alley, the threatening presence of multiple
officers, the aggressive nature of the questioning, and the fact that
[the defendant's] freedom of movement was physically obstructed by
the positioning of the officers and their bicycles."  Id. at 685.  Given
those factors, the court held that a reasonable person in the
defendant's shoes "would not have felt at liberty to ignore the police
presence and go about his business."  Id.

Here, the officers approached Eymann and Lyons in a hotel
parking lot after midnight and placed themselves between Eymann
and Lyons and the hotel.  The officers parked their vehicles behind
the courtesy car Eymann and Lyons had used, restricting its ability
to exit the lot.  Police lights were flashing on at least two of the
vehicles.  (Tr. at 365, 1022-23.)  In such circumstances, a
reasonable person in Eymann's and Lyons' shoes would not have

felt at liberty to ignore the police presence and go about his business.  Thus, the officers initiated a Terry stop, not a consensual encounter, when they approached Eymann and Lyons in the parking lot.

### B. The Terry Stop Was Supported By Reasonable Suspicion.

However, the officers had reasonable suspicion to justify the Terry stop.  A Terry stop is a form of seizure.  United States v. Shoals, 478 F.3d 850, 853 (7th Cir. 2007) (seizure is "an intrusion that is necessarily present in every Terry stop").  To justify such a seizure, police "must be able to point to specific and articulable facts which, taken together with rational inferences drawn from those facts, reasonably warrant that intrusion."  United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1997).  This "reasonable suspicion" requirement presents a "less demanding" standard than probable cause, but the Fourth Amendment requires "at least a minimal level of objective justification for making the stop," and something more than a mere hunch.  United States v. Breland, 356 F.3d 787, 791 n.1 (7th Cir. 2004); United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999).  There must be "some objective

manifestation that the person stopped is, or is about to be, engaged in criminal activity." <u>Ienco</u>, 182 F.3d at 523.

In assessing whether a Terry stop was supported by reasonable suspicion, courts consider "the totality of the circumstances as they were presented to the officer at the time of the encounter." <u>United States v. Odum</u>, 72 F.3d 1279, 1284 (7th Cir. 1995) (quotations omitted).

### a. The AMOC tip, the late arrival to a desolate airport, and unloading a box from the plane are factors supporting reasonable suspicion.

First, Eymann and Lyons argue that the tip from AMOC lacked corroborating support, and thus the tip could not contribute to reasonable suspicion. To the contrary, the tip included specific information about the plane's past flight patterns that supported suspicion. AMOC told DHS that in May 2013, the plane flew from Los Angeles to Pittsburgh, stayed 15 hours, and returned. AMOC also said that in June 2013, the plane did the same thing again, this time staying in Pittsburgh only 5 hours. AMOC said that during both the May and June trips the plane had landed at small, rural airports late at night to refuel. On the night at issue here, the

officers directly observed the plane make such a landing at
Litchfield, further corroborating the tip.  See United States v.
Harris, 585 F.3d 394, 401-02 (7th Cir. 2009) (inclusion of specific
details in tip about suspects' residence, car, and interactions with
others, which then turn out to be correct, supported contention
that tip gave probable cause to stop and search suspect's vehicle).

In his email, Mr. Keller also said that in January 2013, the
plane had been in Watsonville, California, where marijuana planes
had departed from, and Cloverdale, California, which is near Ukiah,
a "known marijuana area."  Gov't Ex. 2A.  Eymann and Lyons point
out that AMOC did not provide any support for this proposition.
Mr. Keller testified that AMOC has caught people using the
Watsonville airport to transport marijuana in the past and that the
Cloverdale airport is very close to the Emerald Triangle, which is an
area "notorious" for marijuana growing and trafficking.  (Tr. 64-66).
Agent Harrington testified that the recent trip to Watsonville and
Cloverdale suggested a connection to potential drug trafficking.

In his email, Mr. Keller also said the plane landed at "closed"
airports to refuel.  The Fixed Base Operators ("FBO") (the main
building at many airports) close at night in most cases—as in

Litchfield.  Although at night the runways of many airports remain
useable, it is nonetheless suspicious for a pilot to land at airports
where he knows the FBO building will be closed because doing so
allows a pilot to avoid detection.  The Court finds that the plane's
use of "closed" airports is a factor justifying reasonable suspicion.
However, a pilot who lands at a "closed" airport presumably must
use a credit or debit card to refuel from a self-service gas pump—
leaving a paper trail that he presumably could have avoided by
refueling at an "open" airport and paying with cash, which
somewhat undercuts this factor.

Mr. Keller also noted in his email that the plane had
suspiciously flown through bad weather.  However, the radar image
that AMOC provided does not show that the plane flew through bad
weather.  The image shows the plane on its June 20, 2013 flight.  It
shows the flight path over Indiana and Illinois, and stormy weather
is plainly visible in the plane's past route at the time the image was
captured.  (Gov't Ex. 3; Tr. 58-59.)  But it does not follow that the
stormy weather existed in the plane's route when the plane was
there.  Rather, the storm clouds could have moved into the plane's

route after the plane had already traveled past that area.  For this reason, the Court finds that the plane's supposed travel through bad weather is not a factor justifying reasonable suspicion.

Even without this factor, the officers had enough evidence to reasonably suspect that the occupants of the plane were engaged in drug trafficking or some other illegal activity.  The most significant factor is the plane's history of flying the long distance from California to Pittsburgh and returning after only hours on the ground.  United States v. Sokolow, 490 U.S. 1, 9 (1989) (flying 20 hours from Hawaii to Miami for only 48-hour-stay contributed to reasonable suspicion); United States v. Ehlebracht, 693 F.2d 333, 337 (5th Cir. 1982) (4 ½-hour stop before returning after long trip was suspicious); United States v. Goldenshtein, No. 10-CR-323, 2011 U.S. Dist. LEXIS 35262 (N.D. Ga. Feb. 22, 2011) (plane's recent "quick-turn" flights contributed to reasonable suspicion); United States v. Gonzales, No. 5:08CR250, 2008 U.S. Dist. LEXIS 67073 (N.D. Ohio Aug. 21, 2008) (reasonable suspicion where small plane had made several short turnaround cross-country flights and had been involved in prior interdiction); United States v. Massi, 761 F.3d 512, 522 (5th Cir. 2014) (officers had reasonable suspicion to

conduct Terry stop after learning of "quick-turn" cross-country flights, recent travel to known illegal drug hub (Tijuana), and plane owner's prior drug conviction); United States v. Simpson, 609 F.3d 1140, 1151-52 (10th Cir. 2010) (driving from Nebraska to spend single night in Reno "contribute[d] to a finding of suspiciousness"); United States v. Salzano, 158 F.3d 1107, 1110 (10th Cir. 1998) ("uneconomical decision to travel across the country in an expensive motor home at a rental cost of $3,900 and a fuel cost of approximately $1,000" contributed to reasonable suspicion); United States v. Dodwell, 2014 U.S. Dist. LEXIS 54968 (W.D.N.C. Jan. 17, 2014) (short visit to Atlanta contributed to reasonable suspicion given "relatively long distance between Atlanta and Johnson City, Tennessee"); United States v. Palen, 793 F.2d 853, 857 (7th Cir. 1994) (describing short stay as normal for drug couriers).

A single long-distance flight followed by a short stop alone may be suspicious.  Here, the fact that the plane made a short stop after a long flight twice in the months before the flight at issue strengthens the suspicion to be reasonably drawn from the plane's flight pattern.  E.g., Goldenshtein, 2011 U.S. Dist. LEXIS 35262 (quick-return flights trips prompted police to conduct surveillance

as plane landed).  The two prior quick-turnaround trips and the stops at rural airports late at night supported the reliability of the tip.

Second, Eymann and Lyons argue that the tip created suspicion only about the plane, a piece of property, rather than about any individuals.  They note that the officers did not know whether Eymann had been involved with either of the plane's previous flights, nor that Lyons had piloted the May 2013 flight. Eymann and Lyons cite a number of cases in support of their contention that suspicion that a place or thing has been used to commit a crime does not create the individualized suspicion of a person that is necessary for probable cause to arrest or search that person.  However, these cases address probable cause, not reasonable suspicion, and the Supreme Court has observed that "[a]spects of [a] vehicle itself may justify [reasonable] suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975) ("For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens.").

Information that raises suspicion about property may properly contribute to reasonable suspicion. The Court need not consider whether such information could be the sole basis of reasonable suspicion because here, the officers observed actions of Eymann and Lyons prior to the initiation of the Terry stop that they considered suspicious. The officers saw Eymann and Lyons deplane after landing at a rural, empty airport late at night. The officers also observed Eymann and Lyons remove a box from the plane and load it into the courtesy car, which they considered to be a suspicious variation from using a suitcase or luggage bag to transport one's personal items. These observations reasonably contributed to the officers' suspicion and were based on Eymann and Lyons as individuals. See United States v. Sanford, 806 F.3d 954, 959 (7th Cir. 2015) (reasonable suspicion when car was driving on highway known to be used to transport drugs from Chicago to Peoria, car was a rental and trooper knew that rental cars were often used to delivery drugs, and occupants had driven from Peoria to Chicago and back with only four hours in Chicago).

Third, Eymann and Lyons argue that the on-scene officers (from DHS and LPD) could not rely on a tip from AMOC to support

reasonable suspicion because AMOC is not a law enforcement agency and Mr. Keller is a civilian, so the collective knowledge doctrine does not apply.  Under the collective knowledge doctrine, the officers carrying out the stop can do so based on information received from another law enforcement authority. <u>Illinois v. Andreas</u>, 463 U.S. 765, 772 n.5 (1983); <u>United States v. Harris</u>, 585 F.3d 394, 400 (7th Cir. 2009).  The officer can make the stop even if he does not have firsthand knowledge of facts amounting to the requisite level of suspicion.  <u>Id</u>.  Rather, "where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all." <u>Illinois v. Andreas</u>, 463 U.S. 765, 772 n.5 (1983). <u>see</u>

The information that Mr. Spencer gave to Officer Harrington falls within the collective knowledge doctrine.  <u>United States v. Nafzger</u>, 974 F.2d 906, 912 (7th Cir. 1992) ("It is not unusual, much less improper, for the collective knowledge doctrine to be applied in cases . . . where one police officer acts based on information provided by another officer who is not at the scene."). Mr. Spencer was a law enforcement officer of AMOC.  (Tr. 64-65). Officer Harrington (and, under the collective knowledge doctrine,

the other DHS and LPD officers on scene) could rely on Mr.
Spencer's suspicion even without knowledge of the supporting facts.
Nafzger, 974 F.2d at 913.

The information that Mr. Keller gave to Mr. Spencer also falls
within the collective knowledge doctrine.  The collective knowledge
doctrine is not limited to information that an officer receives from
another officer.  Collective knowledge also applies to information
that the officer receives from those with the "training, responsibility,
or authority to make a determination of reasonable suspicion."
United States v. Colon, 250 F.3d 130, 137 (2d Cir. 2001).  Examples
include a police dispatcher, United States v. Cutchin, 956 F.2d
1216, 1217-18 (D.C. Cir. 1992), and the District Attorney's office,
Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989).

AMOC is a law enforcement agency within the Customs and
Border Protection agency of the Department of Homeland Security.
Its role is to detect and interdict crime conducted by air, including
terrorism and drug trafficking.  As an intelligence research
specialist, Mr. Keller is responsible for detecting suspicious activity
among aircraft and passing that information along to the
appropriate law enforcement officer.  (Tr. 42).  As a former police

officer, air traffic controller, air traffic supervisor, and AMOC detection enforcement officer, he is trained to do so.  (Tr. 41).  Mr. Keller could properly assess the suspicion warranted by the information he collected and transmitted to Mr. Spencer.  Therefore, the information that Mr. Spencer received from Mr. Keller and in turn relayed to the DHS officers properly contributed to reasonable suspicion.

Regardless, the Court finds that the officers had reasonable suspicion even without the application of the collective knowledge doctrine.  The tip had sufficient indicia of reliability to establish reasonable suspicion.  <u>Florida v. J.L.</u>, 529 U.S. 266 (2000).  The tip came from a federal agency that specializes in monitoring aircraft activity to reduce drug trafficking by air.  Further, an earlier similar tip from AMOC had recently led to a successful arrest and conviction.  Mr. Spencer told Officer Harrington specific details to corroborate suspicion, including that the plane made several cross-country flights with only short times on the ground and landed at small, essentially closed airports.  (Tr. 611, 615-20).  The officers also witnessed firsthand activity by Eymann and Lyons that both corroborated the tip and contributed to the officers' suspicion.

Under these circumstances, the officers had reasonable suspicion even without the application of the collective knowledge doctrine.

Fourth, Eymann and Lyons argue that "profiling" is "not a lawful basis for a Terry stop."  (Def. Post-Hrg. Br. (d/e 74) at 23.) United States v. Dennis, 115 F.3d 524, 532 (7th Cir. 1997) ("The mere fact that certain characteristics that a law enforcement officer observes fit a profile will not establish reasonable suspicion.").  They also contend that Mr. Keller improperly based his suspicions on the General Aviation Threat Assessment (GATA) because it does not cite to data supporting its factors indicative of drug smuggling.  Here, however, Mr. Keller's use of the GATA is inapposite because the officers carrying out the stop found the facts relayed by Mr. Spencer to be suspicious based on their own experience as law enforcement officers.  Agent Harrington testified that the quick turnaround times, from flights departing out of Northern California, and landing during quiet times at the airport may indicate illicit smuggling activity.  (Tr. 617-22, 636-37, 876-77).  "[T]he fact that the[] factors [leading police to have reasonable suspicion of a suspect] may be set forth in a 'profile' does not somehow detract from their

evidentiary significance as seen by a trained agent."  United States v. Sokolow, 490 U.S. 1, 10 (1989).

Eymann and Lyons correctly point out that a person might have perfectly lawful reasons to fly a plane across the continent and then fly back within hours, to land late at night in an empty, rural airport, and to carry a box off of the plane.  But the potential lawfulness of a given person's behavior does not defeat reasonable suspicion, and reasonable suspicion does not require knowledge of actual criminal acts.  Rather, an officer may form reasonable suspicion based on legal, but merely suspicious, activity—in fact, that is perhaps the very nature of reasonable suspicion.  United States v. Ruiz, 785 F.3d 1134, 1141-42 (7th Cir. 2015) (reasonable suspicion where officers observed defendant having strange encounters with multiple vehicles and then engaging in activity suggesting he was manipulating a "drug trap" compartment in his vehicle); United States v. Riley, 493 F.3d 803, 808 (7th Cir. 2007) (reasonable suspicion where officers had no knowledge of actual crime but observed person parking in front of bank with car running and driving away after second person left bank with bag and entered car); United States v. Griffin, 150 F.3d 778, 783 (7th

Cir. 1998) (reasonable suspicion based on series of suspicious but non-criminal activity, where two men entered store being surveilled for illegal drug activity; store's employee physically escorted out store's only customer and locked door; and first man drove away, received large box in alley, loaded it into jeep, and returned to store after driving circuitous route); <u>United States v. Jaramillo</u>, 891 F.2d 620, 627 (7th Cir. 1989) (reasonable suspicion where defendants paid for plane tickets in cash on day of flight from drug-source city with open return date, had luggage for only short trip, had midsections that looked bulky and abnormally shaped, scanned surroundings on arrival as if to conduct counter-surveillance, and took suspicious path through airport concourse).    In sum, the Court finds that the airplane's prior history of flying twice across the country and returning after mere hours on the ground, and the plane's third eastbound cross-country flight, during which Eymann and Lyons landed late at night at an empty, rural airport and carried a box off the plane gave the officers reasonable suspicion to conduct the Terry stop.

## C.  The Scope of the Terry Stop Did Not Expand Into an Arrest.

Having made a Terry stop supported by reasonable suspicion, the officers were required to limit the scope of the stop.  To prevent the stop from becoming an arrest before the officers had probable cause, "a detention must be limited in scope and executed through the least restrictive means."  United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999).  A seizure becomes an arrest when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement to the degree which the law associates with formal arrest."  Id.  The line between a lawful Terry stop and an unlawful arrest "is not bright," and there has been a "multifaceted expansion of Terry" over the years.  United States v. Askew, 403 F.3d 496, 507 (7th Cir. 2005).  Whether a Terry stop was reasonable in scope requires a totality of the circumstances analysis.  United States v. Swift, 220 F.3d 502, 506 (7th Cir. 2000).

"Several factors are relevant in deciding whether a Terry stop has become an arrest including the officer's intent in stopping the individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person stopped could be said to have been taken into

custody." United States v. Rodriguez, 831 F.2d 162, 166 (7th Cir.
1987).

Eymann and Lyons argue that the stop here was from the
beginning—or quickly became—a warrantless arrest. This Court
disagrees and finds that Eymann and Lyons were not under arrest
until the officers handcuffed them after the officers recovered
marijuana from Eymann's bag.

First, the officers did not draw any weapons, and Lyons
testified that he did not see any guns during the initial encounter
(Tr. 1267). The officers did not order Eymann and Lyons to take
any specific certain action. Nor did the officers restrain Eymann's
and Lyons' movement aside from standing between them and the
hotel.

The presence of numerous uniformed, armed officers and
several police vehicles may have constituted a show of force, but not
to the degree associated with a formal arrest. Askew, 403 F.3d at
508-09 (officers' blockade of suspected drug traffickers' car was
justified, given inherent danger, and did not convert stop into
arrest); Illinois v. Wardlow, 528 U.S. 119 (2000) (eight officers in
squad cars involved in legitimate Terry stop); United States v. Felix-

Felix, 275 F.3d 627, 635-36 (7th Cir. 2001) (upholding Terry stop where officers cut off escape route on dead-end street, forcing defendant to speak with police).

Here, the officers' actions were proportional to the circumstances. The officers arrived with multiple police cars, some with lights flashing.[1] Some of the officers wore uniforms, while others were in plain clothes. These actions are justified as reasonable measures to protect against safety concerns and to identify themselves as officers.[2] United States v. Stewart, 388 F.3d 1079, 1085 (7th Cir. 2004) ("requir[ing] an officer to risk his life in order to make an investigatory stop would run contrary to the intent of Terry").

Further, courts have found that encounters much more invasive and restrictive than this one constituted permissible Terry stops under their particular circumstances. United States v.

---

[1] Lyons testified that no police vehicle lights were flashing (Tr. 1266), but if that is true it would simply subtract from the officers' show of force.

[2] Indeed, despite these efforts, Lyons testified that he "had no idea who these guys were" at first. (Tr. 1262.) "It was very scary. I thought these guys were thugs. Big guys. [I] wasn't quite sure what was going on." (Tr. 1262.) Had Lyons had his gun (which was on the plane), and had he truly not known he was being approached by police, the officers' lives could have been in danger.

Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991) (in light of extreme circumstances, Terry stop occurred even though police drew weapons, blocked escape routes with vehicles, ordered suspects to lie down and handcuffed them); United States v. Serna-Barreto, 842 F.2d 965, 967 (7th Cir. 1988) (Terry stop did not become arrest merely because officer pointed gun at suspect, considering encounter happened at night and officer was alone approaching car containing several people, though court acknowledged that this use was "near the outer edge" of Terry permissibility); United States v. Askew, 403 F.3d 496, 507 (7th Cir. 2005) (several officers converging on suspected drug traffickers' car with guns drawn did not convert Terry stop into arrest); United States v. Shoals, 478 F.3d 850, 853 (7th Cir. 2007) (several officers approaching house with guns drawn and ordering suspect out of house did not turn Terry stop into arrest).

Second, the officers investigated their suspicions by asking Eymann and Lyons questions immediately upon meeting them and prior to taking any further action to restrain the Defendants. This course of action fulfilled the purpose of the investigatory stop and supports a finding that the encounter was a Terry stop rather than

an arrest.  An officer conducting a Terry stop is "permitted to ask questions to determine an individual's identity and to obtain information confirming [the] officer's suspicions."  United States v. Johnson, 680 F.3d 966, 974 (7th Cir. 2012) overruled on other grounds by Fowler v. Butts, No. 15-1221, 2016 WL 3916012 (7th Cir. July 20, 2016).  Not only is an officer permitted to question the suspect, an officer's failure to do so may be an indication that the encounter is an arrest, rather than an investigatory stop.  See United States v. Barber, 557 F.2d 628, 632 (8th Cir. 1977) (seizure was arrest, not Terry stop, because "[t]he officers' purpose in going to the car was admittedly not investigatory; in fact, they asked no questions of the three occupants [and instead immediately] arrested [them]").  Indeed, in United States v. Smith, discussed above, the fact that the officer in the alley asked the defendant if he had any weapons was one of the reasons the Seventh Circuit found that the interaction was a Terry stop rather than a consensual encounter. 794 F.3d 681 (7th Cir. 2015).[3]

---

[3] Eymann and Lyons cite the Smith factors as evidence that an arrest occurred here, but the Seventh Circuit used those factors to conclude that the officers had conducted a Terry stop, not a formal arrest.

### D.  Eymann and Lyons Were Not "In Custody" During the Encounter at the Hotel.

Eymann and Lyons also argue that they were "in custody" while in the parking lot and thus the questioning violated their Fifth Amendment rights.  They argue that any evidence the Government gathered prior to reading Eymann and Lyons their Miranda rights should be suppressed.

 "In determining whether a person is in custody," the court "ascertain[s] whether, in light of the objective circumstances of [an] interrogation, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave."  United States v. Borostowski, 775 F.3d 851, 859 (7th Cir. 2014).

Factors include the location of the questioning, the duration of the questioning, statements made during the interrogation, the presence or absence of physical restraints, and the release of the interviewee at the end of the questioning.  Borostowski, 775 F.3d at 859 (Defendant was "in custody" for purposes of Fifth Amendment when over thirteen officers arrived at his home, ordered him to put hands up, handcuffed him, dragged him outside, then pulled him upstairs and questioned him in a small room for three hours, even

though officers told him he was not in custody, tone of questioning remained calm, and Defendant was cooperative); United States v. Ambrose, 668 F.3d 943, 956 (7th Cir. 2012) (in determining whether person was in custody, court should consider whether encounter occurred in public, whether suspect consented to speak with officers, whether officers informed suspect he was not under arrest, whether interviewee was moved to another area, whether there was a threatening presence of several officers and a display of weapons or physical force, whether the officers deprived the suspect of documents needed to depart, and whether the officers' tone was such that their requests were likely to be obeyed).

Whether a suspect is "in custody" is also a factor to determine whether suspect is under arrest for the purposes of the Fourth Amendment. Rodriguez, 831 F.2d at 166.  The Court finds that Eymann and Lyons were not "in custody" during the encounter in the parking lot (until officers handcuffed them and transported them to the airport).  First, the Court finds that the parking lot was "public" or "semi-public" for the purposes of this inquiry.  Eymann and Lyons argue that "[a] hotel is a person's home-away-from-home" (Def. Post-Hrg. Br. (d/e 74) at 30), but this cannot credibly

be said about the parking lot of a hotel where a person does not have a reservation, as Eymann and Lyons did not. "Where an encounter with law enforcement occurs in a public place, the Court has recognized that the public nature of the interaction and the ease of leaving limit the coercive impact." <u>Ambrose</u>, 668 F.3d at 957 (spacious conference room on active floor of a secure building was public for the purpose of determining whether suspect was in custody even though suspect could only traverse with escort).

Second, the duration of the questioning was not long. The encounter commenced with a few questions about Eymann and Lyons' travel plans before Lyons began to feel faint, at which time the officers ceased questioning Lyons about his travel and asked questions only relating to his health. While Lyons recovered his composure, Agent Harrington asked Eymann a few questions about Lyons' health for "a minute or two." (Tr. 667.) He then asked Eymann whether he had brought any marijuana from California. (Tr. 667-68, 1026.) Eymann responded that he had a small amount of personal use marijuana in the courtesy car. (Tr. 548, 668.) Agent Harrington then patted Eymann down and found no contraband on Eymann's person. (Tr. 671.) In addition to

questioning being relatively brief, Lyons testified that the officers' tone was "calm and conversational." (Tr. at 1315.)   This questioning did not indicate that Eymann or Lyons was in custody.

Nor did the officers physically restrain Eymann or Lyons during this time[4] or move them to a different location for questioning.  After Lyons began feeling light-headed, the officers brought him to Chief Wilkinson's vehicle and had Lyons sit in the front passenger seat to recover, but the Court finds that Lyons was not in custody during this time.

In United States v. Rodriguez, the Seventh Circuit considered whether an arrest occurred when an officer asked a suspect to sit in a patrol car for several minutes.  831 F.2d 162 (7th Cir. 1987).  The

---

[4] Defendants point out that the Miranda waiver forms they signed noted that they were taken into custody at 12:40 am.  The Government asserts that the listed time is an incorrect estimate of when Defendants were arrested after the officers recovered the marijuana from the courtesy car.  Agent Mitchell had been tracking times on a notepad that night, including the time that the encounter at the hotel began (12:32 am) and when Arie arrived at the hotel (12:54 am), but he did not have his notepad in the interview room when the Miranda waiver forms were completed.  On the other hand, a 12:40 am arrest would be consistent with Lyons' testimony that the officers searched the car and the bags and handcuffed the Defendants about fifteen minutes before Arie arrived.  (Tr. 1271-73.)  The Court need not resolve this dispute because it finds that the officers had probable cause to search the car without Arie's alert.  See infra Section E.

court called the question "interesting and perhaps close" but concluded that the request "did not connote an intent to take [the suspect] into custody" under the "particular circumstances" of that case.  Id. at 166.  Here, the parties dispute whether the passenger door was open or closed.  Regardless, the circumstances—moving a suspect who feels faint to the air-conditioned front passenger seat of a police car and providing water—did not connote an intent to place Lyons into custody.  The encounter did not become an arrest when the officers moved Lyons to the police vehicle.

Further, although Agent Harrington asked for Eymann's and Lyons' driver's licenses, this action did not deprive them of documents needed to depart as contemplated by the Fifth Amendment.  "In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."  Hiibel v. Sixth Judicial Dist. Court., 542 U.S. 177, 185 (2004); United States v. Hensley, 469 U.S. 221, 229 (1985) ("the ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes a strong government interest in solving crimes and bringing offenders to justice").  Rather than a forceful restraint on movement, Agent

Harrington's taking of Eymann's and Lyons' driver's licenses to check for warrants was a routine act that served the very purpose of a Terry stop – to dispel or confirm suspicion regarding criminal activity.

Taken together with the officers' relatively little show of force, discussed earlier, these factors indicate that Eymann and Lyons were not in custody as the officers proceeded with the initial questioning.  As such, the officers did not need to Mirandize Eymann and Lyons during the questioning in the hotel parking lot. United States v. Burns, 37 F.3d 276, 281 (7th Cir. 1994) ("Miranda warnings are not required where a suspect has been detained pursuant to a Terry investigatory stop"); Johnson, 680 F.3d at 975 (Miranda warning unnecessary when person is temporarily detained during Terry stop).

Because the officers used very little show of force, conducted reasonable questioning, and did not take Eymann and Lyons into custody, the Court finds that a reasonable person would not have understood Eymann and Lyons's freedom of movement to be restrained to the degree associated with a formal arrest.  Thus, the

scope of the Terry stop did not expand into an arrest without probable cause.

### E. Eymann's Admission That He Had Marijuana in the Courtesy Car Provided Probable Cause to Search the Car.

The parties dispute the timeline of events with respect to the drug-detection dog that arrived on the scene at some point during the parking lot encounter. Agent Harrington testified that the dog was requested before Eymann admitted to having marijuana in the car, and that Arie arrived a few minutes after Eymann's admission. (Tr. 668-70.). The officers testified that Arie then alerted to the car, the officers then removed Eymann's and Lyons' bags from the car, Arie then alerted to Eymann's backpack, and the officers recovered marijuana from the backpack.

On the other hand, Eymann and Lyons assert that the officers searched the car and removed the bags from the car before Arie arrived on scene. Lyons testified that he spent three to five minutes (Tr. 1265, 1269) regaining his composure in Chief Wilkinson's car, and when he exited the car Chief Wilkinson searched him and took his possessions. (Tr. 1263-64.) Lyons then saw that his duffle bag was already on the ground, and he saw

Agent Mitchell looking through his second bag.  (Tr. 1269-70.)
Lyons testified that he was in handcuffs at this point, and it was
only then that an officer said, "I think we should call for the dog."
(Tr. 1271.)  Lyons testified that Arie did not arrive until 14 or 15
minutes after he and Eymann were handcuffed and formally placed
under arrest.  (Tr. 1273.)

The Court need not resolve this factual dispute.  Probable
cause to search a vehicle exists if, "given the totality of the
circumstances, there is a fair probability that contraband or
evidence of a crime will be found in a particular place."  United
States v. Scott, 516 F.3d 587, 589 (7th Cir. 2008) (internal
quotations omitted).  When Eymann admitted to having marijuana
in the car, the officers had probable cause to search it even without
a drug-detection dog's alert.  "Admissions of crime, like admissions
against proprietary interests, carry their own indicia of credibility—
sufficient at least to support a finding of probable cause to search."
United States v. Harris, 403 U.S. 573, 583 (1971) (informant's
admission that he illegally bought liquor on premise, itself and
without more, gave probable cause); see United States v. Guidry,
817 F.3d 997, 1007 (7th Cir. 2016) (existence of drugs in

defendant's car and defendants' admission to using drugs in home "provided probable cause" to search home).

Lyons testified that Eymann was already handcuffed when the officers asked Eymann if Eymann had "anything in the car that we're gonna find that you don't want us to find," and that only then—while already in handcuffs—did Eymann admit to having personal use marijuana in the car.  (Tr. 1272.)  The Court discounts this testimony for being inconsistent with Lyons's earlier testimony that the bags from the courtesy car were already on the ground by the time Lyons got out of Chief Wilkinson's car.  Moreover, Lyons admits he was in Chief Wilkinson's car for 3-5 minutes, and Agent Harrington only spoke to Eymann for "a minute or two" before learning about the marijuana.  (Tr. 667.)  Thus, it stands to reason that Lyons was recovering in Chief Wilkinson's car while Agent Harrington spoke with Eymann about the marijuana, and that Lyons was not likely privy to that conversation.

### F. Lyons Has Standing to Challenge the Search of the Courtesy Car.

In order to have standing to challenge a search or seizure, Eymann and Lyons must establish that they each had "both a

subjective and an objectively reasonable expectation of privacy."
United States v. Walton, 763 F.3d 655, 658 (7th Cir. 2014).  A
person has an objectively reasonable expectation of privacy if the
expectation is one society is prepared to accept as reasonable.  Id.
Determining whether a person had a subjectively reasonable
expectation of privacy is a fact-specific inquiry that looks to the
person's steps to conceal and keep private the item at issue.  Id.

The Seventh Circuit has written that "[f]or standing purposes,
it is typically enough that the driver is operating [a] vehicle with the
permission of the owner."  Walton, 763 F.3d at 664.  The driver of a
"borrowed vehicle may establish a reasonable expectation of
privacy" in the vehicle because the driver "has the right to exclude
others."  Johnson v. United States, 604 F.3d 1016, 1020 (7th Cir.
2010).  The Government argues that Lyons had no right to exclude
because he would have had to return the car if the owners had
asked, and because he would have had to share the car or give
rides to another pilot who landed later that evening and requested
the car.  (Tr. 650, 1291-92.)  The Government describes the
courtesy car as "one step above a stolen car" (Post-Hrg. Br. at 75),
noting that the driver of a stolen vehicle has no standing to

challenge a search of that car.  United States v. Sholola, 124 F.3d 803, 816 n.14 (7th Cir. 1997).

The Court finds that the courtesy car is more similar to a rental car than to a stolen car.  Lyons' wife—herself a pilot—testified that the borrower of such a courtesy car would have exclusive rights to the car "for the period of time that they have it checked out."  (Tr. 1206.)  Lyons had the right to exclude others from the courtesy car at least for the time during which the car was in his possession and no other pilot had requested its use.  Further, unlike the driver of a stolen car, Lyons had permission to drive the courtesy car and to take it where he wished, similar to a rental car.  Drivers of rental cars "undoubtedly regard the space inside the car as private while they possess it."  Walton, 763 F.3d at 665.

The Court therefore finds that Lyons had both a subjective expectation of privacy in the courtesy car, and an objective expectation of privacy in that society is prepared to recognize that expectation as reasonable.  Thus, Lyons has standing to challenge the search of the car.

### G.  Eymann Does Not Have Standing to Challenge the Search of the Courtesy Car.

Unlike Lyons, Eymann does not have standing to challenge the search of the courtesy car because he was merely a passenger in the car.  "One of the central distinctions courts have drawn … is that between a driver of a car and a passenger."  <u>United States v. Walton</u>, 763 F.3d at 666.  A mere passenger lacks standing because a passenger cannot prevent the driver or owner of the car from inviting other persons to enter the vehicle, including police.  <u>Id.</u>

Two exceptions to this rule do allow a passenger to challenge a search of a vehicle.  The first exists where the passenger asserts a property or possessory interest in the vehicle.  <u>Rakas v. Illinois</u>, 439 U.S. 128, 129 (1978).  Here, Eymann cannot assert a property or possessory interest in the courtesy car.  He had no ownership over the car, nor, as a passenger, did he have any control over it.  Further, while Lyons had a possessory interest in the car as the pilot who signed the car out from the FBO, Eymann was not a pilot and was a mere passenger on the plane.

The second exception arises where the passenger's person is seized, such as when police stop the car.  The passenger has standing to challenge the seizure of his person, as well as the search that resulted from the seizure if the seizure was unlawful.

Brendlin v. California, 551 U.S. 249, 256–59 (2007); United States v. Sanford, 806 F.3d 954, 958–59 (7th Cir. 2015).  Eymann does not have standing here.  His person was seized when the officers stopped him and Lyons in the parking lot, but it was a lawful seizure.  Supra, Sections A-C.  Thus, Eymann does not have standing to challenge the search of the courtesy car.

## H. The Discovery of Marijuana in the Courtesy Car Provided Probable Cause to Arrest Eymann.

Once the officers found the marijuana in the car, the officers had probable cause to arrest Eymann because Eymann had already admitted that the marijuana was his.  Illinois has recently taken steps on the road to marijuana legalization—the state has legalized medical marijuana and decriminalized possession of small amounts of non-medical marijuana—but marijuana possession remains a federal crime.  "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  Brinegar v. United States, 338 U.S. 160, 175 (1949) (internal quotation marks omitted).

## I. The Totality of Events Leading to Lyons's Arrest Provided Probable Cause to Arrest Lyons.

The officers also had probable cause to arrest Lyons.  In Maryland v. Pringle, the Supreme Court held that officers who found drugs in a car had probable cause to arrest all three of the car's passengers where: (1) the drugs were accessible to all three men (the drugs were found behind the car's backseat armrest), and all three men failed to offer any information about the drugs' ownership.  540 U.S. 366, 372 (2003).  Here, Eymann's backpack was in the courtesy car's main cabin—it was not enclosed in a trunk.  On the other hand, the backpack belonged to Eymann, which could be said to have reduced Lyons' accessibility to the marijuana.  Further distinguishing Pringle, if we are to accept Lyons's version of events, Lyons was arrested immediately after getting out of Chief Wilkinson's car—not after being questioned about the marijuana and providing no information.

Despite these factual differences from Pringle, in assessing whether an officer had probable cause to arrest someone, the Court "examine[s] the events leading up to the arrest" and decides "whether these historical facts, viewed from the standpoint of an

objectively reasonable police officer," amounted to probable cause. Pringle, 540 U.S. at 371 (internal quotation marks omitted).  Here, the officers knew more than simply that Lyons had been in a car with both Eymann and marijuana belonging to Eymann.  They also knew that Lyons had been carrying $2600 in cash, loaded a box from a plane, and upon being confronted by law enforcement, experienced a fainting episode.  As Agent Harrington testified, such activity is a "visible indicator" that the person being questioned is engaged in illegal activity.  (Tr. 665.)  And, these facts were in the context of an investigation into whether the suspects were using an airplane to deliver drugs, based on two previous cross-country flights with minimal time spent at the destination and multiple landings at rural, closed airports, and on the most recent flight Lyons had been identified as the pilot.  The Court finds that these events leading up to Lyons' arrest were sufficient to create probable cause to arrest Lyons.

**J. Defendants' Motion to Suppress is Denied With Respect to the Evidence Procured in the Hotel Parking Lot.**

The Court has found that the officers conducted a Terry stop in the hotel parking lot; that reasonable suspicion justified the stop;

that Eymann's admission to having marijuana in the courtesy car justified searching the courtesy car; that finding marijuana in the courtesy car provided probable cause to arrest Eymann; and that the totality of the events leading up to Lyons's arrest provided probable cause to arrest Lyons.  The Court consequently denies the motion to suppress with respect to the evidence procured and statements made in the hotel parking lot.

### K.  The Search of the Plane Was Lawful

Eymann and Lyons also argue that the Court should suppress the evidence discovered during the warrantless search of the airplane—namely, the 65 pounds of marijuana and Lyons' handgun.  Because the Court finds that the encounter at the hotel was lawful, the Court need not address the Government's arguments that the plane search was attenuated from the events at the hotel, that the officers discovered the evidence seized from the plane through a source independent of the hotel encounter, or that the officers inevitably would have discovered the evidence seized from the plane through means irrespective of the hotel encounter.

As a preliminary matter, Lyons has standing to challenge the search of the plane because he was the pilot and had his wife's

permission to fly her plane.  Thus, Lyons' standing to challenge the search of the plane is closely analogous to his standing to challenge the search of the courtesy car.  See supra Section F.  The Court also notes that in California, a community property state, Lyons may also have an ownership interest in the plane.

Eymann does not have standing to challenge the search of the plane.  See supra Section G.  He cannot establish a property or possessory interest in the plane.  See Rakas v. Illinois, 439 U.S. 128, 129 (1978).  Nor was his arrest unlawful.  See United States v. Sanford, 806 F.3d 954, 958–59 (7th Cir. 2015).  Thus, Eymann does not have standing to challenge the search of the plane.

First, the automobile exception to the warrant requirement applies to airplanes.  See, e.g., United States v. Linn, 30 F.3d 132, 1994 WL 399179, at *2 (4th Cir. 1994) (unpublished) ("This doctrine, known as the "automobile exception," applies with equal force to the warrantless search of an airplane."); United States v. Rollins, 699 F.2d 530, 534 (11th Cir. 1983) (finding "no difference between the exigent circumstances of a car and an airplane"); United States v. Finefrock, 668 F.2d 1168, 1171-72 (10th Cir. 1982) (finding same rationale as applies to automobile exception applied

to airplane parked at public airport); <u>United States v. Gooch</u>, 603 F.2d 122, 125 (10th Cir. 1979) (noting "an airplane is even more mobile in terms of its ability to cover great distances in a short time and its capacity to move without being restricted to discrete roadways."). Thus, the officers could lawfully search the plane if they had probable cause.

**L. The Officers Properly Deployed Arie To Sniff The Plane**

Before they set out for the hotel, Eymann and Lyons left the plane on the runway of the airport. When the officers returned to the airport from the hotel parking lot, they entered the airport gate with the permission and assistance of airport agents. (Tr. 486, 966.) Thus, the officers were lawfully present on the runway. The officers were also permitted to bring Arie to the plane and instruct him to conduct a sniff test. Police officers need no articulable reason to call in a drug-sniffing dog, provided that doing so does not otherwise invade the individual's legitimate interest in privacy. <u>Illinois v. Caballes</u>, 543 U.S. 405, 407-08 (2005); <u>see also</u> <u>United States v. Jacobsen</u>, 466 U.S. 109, 123 (1984) (holding that any interest in possessing contraband cannot be "legitimate" and thus government conduct that reveals only possession of contraband

"compromises no legitimate privacy interest"); <u>United States v.</u>
<u>Place</u>, 462 U.S. 696, 706-07 (1983) (establishing that dog sniff of
luggage does not constitute Fourth Amendment search).  Eymann
and Lyons had no legitimate privacy interest in the marijuana in
the plane on which Arie alerted.  <u>See</u> <u>Jacobsen</u>, 466 U.S. at 123.
Further, deploying Arie around the airplane did not invade
Eymann's or Lyons' legitimate interest in privacy because the
airplane was parked on an open runway that was accessible to
others.  <u>United States v. Grogg</u>, 534 F.3d 807, 810-11 (7th Cir.
2008) (no Fourth Amendment issue with deploying dog around
vehicle parked in public parking garage).  The drug-sniff test
therefore required no justification itself.

## M. Arie's Alert at the Plane Established Probable Cause to Search the Plane

Eymann and Lyons argue that Arie's alert could not establish
probable cause to search the plane because Arie was uncertified at
the time of the drug-sniff test and because Arie was unreliable.

As to Arie's reliability, Eymann and Lyons assert that Arie had
only a 44% success rate.  Defendants arrive at this figure by
excluding Arie's alerts where no drugs were found but the suspect

admitted to having had drugs or used drugs recently.  The Court

finds that such a limited definition of success unfairly misstates

Arie's reliability.  Including these "lingering odor" scenarios, in 2012

Arie successfully alerted to the presence of drugs during 29 out of

29 sniffs.  (Supp. Tr. 1048).  Eymann and Lyons also argue that

Arie is "programmed" to alert every time because he gets a treat

when he alerts, regardless of whether drugs are found.  While Arie

may be rewarded for performing a sniff-test, Defendants'

formulation of his incentives suggests that Arie will alert regardless

of whether drugs are present.  Such an assertion ignores Officer

Grammer's testimony about the success Arie has had during

training tests.  In one test given to experienced drug-sniffing dogs,

the dogs went through an entire building that had no drugs inside,

and Arie was the only dog who did not alert anywhere in the

building.  The Government has sufficiently demonstrated Arie's

reliability such that an alert by him can create probable cause.

Nor did Arie's lack of technical certification at the time of the

drug-sniff test of the plane preclude a finding of probable cause

upon his alert at the plane.  Eymann and Lyons point out the

problematic record-keeping procedures surrounding Arie's

certifications.  However, the technical deficiency in Arie's certification at the time of the sniff-test does not establish that Arie was unreliable.  The U.S. Supreme Court has held that even in the absence of formal certification, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  Florida v. Harris, 133 S. Ct. 1050, 1057 (2013).  At the time of the drug-sniff of the plane, Arie had recently successfully completed a number of training programs that evaluated his skill in detecting drugs such that his alert could establish probable cause.

### N. The Montgomery County Circuit Court Order Suppressing the Evidence Does Not Bind This Court

In the earlier state proceedings concerning these events, the Montgomery County Circuit Court found that Arie's alerts to the plane did not establish probable cause because Arie was not technically certified as a drug-sniffing dog on the day of the events. The court reasoned that 50 ILCS 705/10.12, which requires that all drug-sniff police dogs "be trained by programs that meet the minimum certification requirements set by the Board," precluded probable cause from an alert by an uncertified dog.  The court

therefore held that the search of the plane was unlawful.  The court also held that the encounter at the hotel was a warrantless search and that the inevitable discovery doctrine was inapplicable to the plane search.  Thus, the court suppressed the evidence obtained from the searches.

The Government correctly notes that the state ruling does not bind this Court.  Under the principle of dual sovereignty, a state decision does not bar a subsequent federal decision regarding the same set of events. See United States v. Davis, 906 F.2d 829, 832 (2d Cir. 1990) ("The states and the national government are distinct political communities, drawing their separate sovereign power from different sources, each from the organic law that established it. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses.").  Thus, "the suppression of evidence in a state prosecution normally does not prevent the United States from using that evidence in a federal proceeding."  Id.

Nor is the Government collaterally estopped from litigating the Fourth and Fifth Amendment issues in federal court.  In order for collateral estoppel to preclude relitigation of an issue, the party

against whom estoppel is to apply must have had a "full and fair opportunity" to litigate the issue in the first proceeding.  United States v. Sherman, 912 F.2d 907, 909 (7th Cir. 1990).  To meet this requirement, the party must either have been a party to the first proceeding, or be in privity with a party to the first action.  Privity may be present where "a non-party substantially controls, or is represented by, a party to the action," United States v. Perchitti, 955 F.2d 674, 676 (11th Cir. 1992), or where the first prosecuting entity is merely a "tool" of the other, which would make the second prosecution a "sham and cover" for the first.  United States v. Tirrell, 120 F.3d 670, 677 (7th Cir. 1997).

Here, the United States was not a party to, nor did it participate in, the state suppression hearing.  The Defendants point out that the United States and the State undertook a cooperative investigation effort.  However, joint effort by law enforcement does not mean that the Illinois prosecutor represented the interests of the United States in the suppression hearing.  See Perchetti, 955 F. at 677 (cooperation between U.S. and state law enforcement during investigation and arrest did not establish privity between the U.S. and state prosecutors for purposes of collateral estoppel); Bartkus

v. People of State of Ill., 359 U.S. 121 (1959) (the sharing of

evidence between the U.S. Government and the State of Illinois did

not mean that the State prosecution barred a second prosecution

by the U.S. Government).

### III.  CONCLUSION

For the reasons above, the motion to suppress (d/e 26) is

DENIED.

ENTERED:  October 5, 2016


FOR THE COURT:              s/ Sue E. Myerscough

                            SUE E. MYERSCOUGH

                            UNITED STATES DISTRICT JUDGE